UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| METROPOLITAN LIFE INSURANCE COMPANY, TRINET HR XI, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> DURIN MUNDAHL, INDIVIDUALLY AND AS THE PERSONAL REPRESENTATIVE OF THE ESTATE OF JOYE M. BRAUN; AND MORGAN BRINGS PLENTY, INDIVIDUALLY; <br><br> Defendants. | 3:24-CV-03029-RAL <br><br><br> OPINION AND ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION |

Plaintiffs Metropolitan Life Insurance Company ("MetLife") and TriNet HR XI, Inc. ("TriNet") (collectively "Plaintiffs") seek a preliminary injunction to prevent Durin Mundahl and Morgan Brings Plenty (collectively "Defendants") from pursuing their action in the Cheyenne River Sioux Tribal Court during the pendency of this case. Doc. 13. Defendants filed a Motion to Stay or Dismiss Action to have this Court defer to the tribal court. Doc. 25. Ruling on these motions requires applying different standards, but the arguments surrounding each considerably overlap. Although principles of comity and tribal exhaustion generally require a federal court to abstain from ruling when there is a pending action in tribal court, these principles do not apply if the proceeding would be patently violative of express jurisdictional prohibitions. Plaintiffs have made a sufficient showing under the Dataphase factors to warrant a preliminary injunction, and a

1

dismissal or stay of this action is improper due to the apparent lack of tribal court jurisdiction over ERISA-governed plans and suits regarding such plans.

I.   STANDARDS GOVERNING PENDING MOTIONS

  A. **Preliminary Injunction Factors**

Plaintiffs seek a preliminary injunction under Rule 65(a) of the Federal Rules of Civil Procedure. "A district court considering injunctive relief evaluates [1] the movant's likelihood of success on the merits, [2] the threat of irreparable harm to the movant, [3] the balance of the equities between the parties, and [4] whether an injunction is in the public interest." Powell v. Ryan, 855 F.3d 899, 902 (8th Cir. 2017) (citing Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). These four considerations are commonly known within the Eighth Circuit as the "Dataphase factors." "No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue. However, in deciding whether to grant a preliminary injunction, likelihood of success on the merits is most significant." Turtle Island Foods, SPC v. Thompson, 992 F.3d 694, 699 (8th Cir. 2021) (cleaned up and citations omitted). A preliminary injunction is an "extraordinary remedy," and the burden of establishing that such an injunction should enter rests with the moving party, here the Plaintiffs. Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003).

  B. **Motion to Dismiss Standard**

When considering a motion to dismiss, courts must accept the plaintiff's factual allegations as true and make factual inferences in favor of the plaintiff but need not accept a plaintiff's legal conclusions. Retro Television Network. Inc. v. Luken Commc'n. LLC, 696 F.3d 766, 768–69 (8th Cir. 2012). To withstand such a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal,

2

556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," Iqbal, 556 U.S. at 678, "even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely,'" Twombly, 550 U.S. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

## II. PROCEDURAL AND FACTUAL HISTORY

The parties do not dispute many of the core facts. This Court makes no findings of fact at this point and draws the facts from what seems uncontested among Plaintiffs' Complaint, Defendants' Complaint in tribal court, Defendants' "Preliminary Statements of Material Facts," and documents that the parties reference and attach.

Joye M. Braun ("Joye") was an employee of Indigenous Environmental Network ("IEN") and a member of the Cheyenne River Sioux Tribe. Doc. 1-1 ¶ 1; Doc. 23 at 11–12. Plaintiff TriNet provided human resource services for IEN, including providing group insurance plans, handling payroll, and issuing Joye's paychecks. See Doc. 23 at 12; Doc. 24-12. Defendants are the natural children of Joye and reside in Eagle Butte on the Cheyenne River Indian Reservation. Doc. 1 ¶¶ 3–4; Doc. 1-1 ¶ 1. Joye was married to Floyd Braun[1] ("Floyd"), but she filed a divorce action in tribal court on October 25, 2022. Doc. 1 ¶ 16; Doc. 11 ¶ 14; Doc. 23 at 14. Floyd may have deserted Joye as early as April 30, 2021. See Doc. 23 at 14. Joye's listed status on certain TriNet-generated payroll forms apparently was "single." Id.

---

[1] Floyd Braun's name sometimes appears in the record as Floyd Durin. See Doc. 1 ¶ 16. For clarity, this Court will refer to him as Floyd to prevent confusion with Joye or Defendant Durin Mundahl.

3

Joye participated in a life insurance and accidental death and dismemberment ("AD&D") plan (the "Plan") sponsored by TriNet as a benefit of her employment with IEN and paid premiums by payroll deductions. Doc. 1 ¶ 10; Doc. 23 at 12. The Plan provided basic life insurance coverage for $40,000 and AD&D coverage for an additional $40,000. Doc. 1 ¶ 12; Doc. 13-1 at 5; Doc. 23 at 12. Plaintiff MetLife is the claim administrator and provider of the benefits under the Plan. Doc. 1 ¶ 13.

Joye did not initially designate a beneficiary for her life insurance. Doc. 1 at ¶ 15. During an "open season," Joye submitted a benefit election on November 4, 2022, designating the Defendants (her biological children) as her life insurance beneficiaries. Doc. 23 at 15; Doc. 24-9 at 2. The parties dispute when the beneficiary designation became effective. Plaintiffs claim its effective date was January 1, 2023, since it was completed during open enrollment. The Open Enrollment Confirmation started "Thank you for submitting your TriNet benefit election for the upcoming benefits plan year (January 1, 2023–December 31, 2023)." Doc. 24-9 at 1. Defendants point to language from the Plan to argue that the designation was immediately effective. The Plan states: "You may change Your Beneficiary at any time. . . . When We receive the change, it will take effect as of the date You signed it." Doc. 1-2 at 60.

Joye died on November 13, 2022. Doc. 1 ¶ 14; Doc. 23 at 16. Her death certificate stated she died from "natural causes," apparently due to a sudden and unexpected cardiac event. Doc. 1-2 at 69. The death certificate lists cause of death as "cardiac arrest, COVID 19 infection, hypertensive heart disease," and the manner of death as "natural causes." Id.

The Plan contained a provision regarding distribution of benefits if no beneficiary is named. Doc. 1-2 at 60. The provision stated: "If there is no Beneficiary designated or no surviving designated Beneficiary at Your death, We may determine the Beneficiary to be one or more of the

4

following who survive You: Your Spouse or Domestic Partner; Your child(ren); Your parent(s); or Your sibling(s)." Id. Floyd and Defendants made claim for the life insurance benefits. Doc. 1 ¶¶ 17, 19. MetLife paid Floyd $ 40,191.74 in life insurance benefits. Doc. 1 ¶ 18; Doc. 1-2 at 71.

The Plan included provisions regarding "ERISA Information" and a "Statement of ERISA Rights." Doc. 1-2 at 63–68. The Statement of ERISA Rights started: "As a participant in the Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA)." Doc. 1-2 at 67. Defendants contest that the life insurance is part of an ERISA-governed plan and point to an email titled "Your TriNet Benefits Enrollment Confirmation" sent to Joye confirming her elections during the open enrollment period. Doc. 24-9. That email contained the following language: "Voluntary benefit plans are offered by Aflac or MetLife and are not ERISA-covered group health insurance plans. Enrollment is completely voluntary." Id. at 4. The same email also stated: "TriNet is the single-employer sponsor of all its benefit plans, which does *not* include voluntary benefits that are not ERISA-covered group health insurance plans and enrollment is voluntary. Official plan documents always control . . . ." Id. at 5 (emphasis added). The email also stated: "In the event there is a conflict between any of the information contained in any benefits guidance materials provided by TriNet (including but not limited to . . . the Benefits Enrollment Confirmation Email . . . ) and the TriNet Plan document, the Plan document shall control." Id. at 4.

Mundahl, individually and on behalf of the Estate of Joye M. Braun, and Brings Plenty sued MetLife and TriNet in Cheyenne River Sioux Tribal Court asserting various common law (non-ERISA) claims in connection with the Plan. Doc. 1 ¶¶ 21–22. Defendants also served extensive written discovery on Plaintiffs in the tribal court action. See Doc. 13-2. Plaintiffs filed a motion to dismiss and a motion for protective order in the tribal court proceeding. Doc. 1-2 at 1;

5

Doc. 13-3 at 2. The tribal court has not yet ruled on these motions. Defendants have not briefed the motions and Defendants' counsel agreed not to schedule a hearing until this Court ruled on the pending motions.

Plaintiffs filed this action requesting this Court to exercise ERISA jurisdiction over the disputes because it involved benefits under the Plan, to declare the rights and obligations of these parties regarding the benefits at issue, and to enjoin Defendants from attempting to assert jurisdiction over them and proceeding with the case in Cheyenne River Sioux Tribal Court. Doc. 1 ¶ 27. Plaintiffs now seek a preliminary injunction to prevent Defendants from proceeding further with their action in tribal court during the pendency of this case. Doc. 13. Defendants wish to proceed in tribal court and have this action dismissed or stayed. Doc. 25.

The motions, briefing and hearing in this case presented issues of whether ERISA governs and preempts the common law claims, whether there is tribal court subject matter and personal jurisdiction over the Plaintiffs, whether this Court should defer to the tribal court to make decisions on ERISA preemption and tribal court jurisdiction, and whether the Dataphase factors merit entering a preliminary injunction. Each issue is discussed below.

### III. DISCUSSION AND ANALYSIS

#### A. Whether the Plan is Subject to ERISA

ERISA governs "employee benefit plan[s]." 29 U.S.C. § 1003(a). "The term 'employee benefit plan' or 'plan' means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U.S.C. § 1002(3). ERISA further defines "employee welfare benefit plan" as:

> [A]ny plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase

of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services . . . .

29 U.S.C. § 1002(1). "[T]he words 'plan' and 'program' in § 1002(1) strongly imply benefits that an employer provides to a class of employees." Dakota, Minn. & E. R.R. v. Schieffer, 648 F.3d 935, 938 (8th Cir. 2011). "ERISA comprehensively regulates certain employee welfare benefits and pension plans." Bannister v. Sorenson, 103 F.3d 632, 635 (8th Cir. 1996) (citation omitted).

Plaintiffs assert the Plan is governed by ERISA. Plaintiffs point to the Plan document for this assertion. The Plan document expressly contains provisions regarding ERISA Information and a Statement of ERISA Rights. The Statement of ERISA Rights states: "As a participant in the Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA)." Doc. 1-2 at 67. Multiple provisions in the Plan refer to ERISA. Joye was able to participate in this plan as a benefit of her employment with IEN, not as an individual seeking private insurance.

Defendants assert the Plan is not subject to ERISA. Defendants do not contend that the Plan is a "governmental plan" as defined under ERISA.[2] Defendants instead point to language in

---

[2] "ERISA does not regulate so-called 'governmental plans.'" Coppe v. Sac & Fox Casino Healthcare Plan, No. 14-2598, 2015 WL 1137733, at *2 (D. Kan. Mar. 13, 2015) (citing 29 U.S.C. § 1003(b)(1)).

"Governmental plans" are defined to include "a plan which is established and maintained by an Indian tribal government . . . a subdivision of an Indian tribal government . . . or an agency or instrumentality of either, and all of the participants of which are employees of such entity substantially all of whose services as such an employee are in the performance of essential governmental functions but not in the performance of commercial activities (whether or not an essential government function)."

Id. (quoting 29 U.S.C. § 1002(32)). IEN does not appear to be a subdivision of a tribe.

7

the Benefit Enrollment Confirmation email sent to Joye confirming her new elections for year 2023 to make this assertion: "Voluntary benefit plans are offered by Aflac or MetLife and are not ERISA-covered group health insurance plans. Enrollment is completely voluntary." Id. at 4. This language refers to "group health plans," not life insurance and AD&D coverage, which is at issue here. Defendants overlook other language in the email stating "TriNet is the single-employer sponsor of all its benefit plans, which does not include voluntary benefits that are not ERISA-covered group health insurance plans and enrollment is voluntary. Official plan documents always control . . . ." Id. at 5. The email also stated: "In the event there is a conflict between any of the information contained in any benefits guidance materials provided by TriNet (including but not limited to . . . the Benefits Enrollment Confirmation Email . . . ) and the TriNet Plan document, the Plan document shall control." Id. at 4. The email confirming Joye's benefit elections does not alter that Joye's life insurance was a benefit under an ERISA-governed plan offered through her employment and where the premiums were paid out of her TriNet paychecks. ERISA governs Defendants' claims relating to Joye's life insurance, including Plaintiffs' decision to pay Floyd rather than Defendants the death benefit.

## B. Whether to Defer to Tribal Court Jurisdiction

### 1. ERISA Jurisdiction in Tribal Court

ERISA authorizes a "participant or beneficiary" to bring a civil action "to recover benefits due" under the terms of a plan and to enforce or clarify rights under a plan. 29 U.S.C. § 1132(a)(1). ERISA vests exclusive jurisdiction with federal district courts for certain claims, but provides that

> [s]tate courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under paragraphs (1)(B) [benefits due under a plan, or enforcing or clarifying rights under a plan] and (7) of subsection (a) [an action by a State to enforce compliance with a qualified child support order].

29 U.S.C. § 1132(e)(1). ERISA does not vest jurisdiction in or even mention tribal courts. See 29 U.S.C. § 1132(e). The text of ERISA does not suggest that tribes have concurrent jurisdiction under § 1132(e). After all, tribal courts are distinct from "state courts of competent jurisdiction." See Nygaard v. Taylor, 78 F.4th 995, 1000–01 (8th Cir. 2023); Nygaard v. Taylor, 602 F. Supp. 3d 1172, 1186–991 (D.S.D. 2022) (explaining how tribes are not "state" or "territory" for purposes of the Parental Kidnapping Protection Act).

The purpose of ERISA does not seem to contemplate concurrent tribal court jurisdiction. Congress passed ERISA to safeguard "the interests of participants in employee benefit plans and their beneficiaries" through regulatory requirements and provide "for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b); Aetna Health Inc. v. Davila, 542 U.S. 200, 208–09 (2004). To accomplish this, ERISA has an expansive federal preemption provision in 29 U.S.C. § 1144, which is intended to ensure that employee benefit plan regulation would be "exclusively a federal concern." Davila, 542 U.S. at 208 (quoting Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523 (1981)).

Several federal district courts have issued opinions on whether a federal court should defer to a tribal court to adjudicate claims under an ERISA-governed plan. The three more recent decisions—Coppe, 2015 WL 1137733; Peabody Holding Co., LLC v. Black, No. CV-12-08252, 2013 WL 2370620 (D. Ariz May 29, 2013); Vandever v. Osage Nation Enter., Inc., No. 06-CV-380, 2009 WL 702776 (N.D. Okla. Mar. 16, 2009)—held that tribal courts lack adjudicatory authority over ERISA claims. The oldest of the four cases—Prescott v. Little Six, Inc., 897 F. Supp. 1217 (D. Minn. 1995)—deemed it proper to abstain to allow exhaustion of tribal court remedies on whether an ERISA plan existed and whether benefits were wrongfully denied. Between the time of the Prescott decision in 1995 and the decisions in Coppe, Peabody Holding,

and Vandever, the Supreme Court of the United States issued a decision in El Paso Natural Gas Co. v. Neztsosie, 526 U.S. 473 (1999) that, while not an ERISA case, guides the analysis.

In Neztsosie, Navajo nation members sued in Navajo tribal court alleging harm from uranium mining company operations on the Navajo reservation presenting a claim implicating the Price-Anderson Act. 526 U.S. at 477–78. The Supreme Court in upholding a federal district courts' enjoining of the tribal court action referred to the preemptive impact of the Price-Anderson Act. Id. at 484–85. Indeed, the Court compared the Act's "unusual preemption provision" to the preemption provision of the Labor Management Relations Act and ERISA. Id. at 484, 484 n.6. The Court reasoned that provisions of the Price-Anderson Act that granted original federal jurisdiction and allowed removal to federal court reflected Congress expressing "an unmistakable preference for a federal forum." Id. at 484–85.

Presumably a tribal court could have authority to make an initial determination if a valid ERISA plan exists. Indeed, the court in Peabody Holding, reconciled and distinguished Prescott by stating: "The district court opinion [in Prescott] merely held that the 'exclusive jurisdiction' provision in § 1132(e)(1) did not bar the tribal court from adjudicating the question of whether a valid ERISA plan existed, not that the federal courts do not have exclusive jurisdiction over ERISA actions otherwise subject to § 1132(e)(1)." Peabody Holding, 2013 WL 2370620, at *5 (citation omitted). But that does not change the fact that Congress meant to allow a federal forum, either through original jurisdiction or removal, to adjudicate ERISA claims for benefits. Allowing a tribal court to adjudicate an ERISA-governed claim defeats the congressional intent to provide an option for a federal forum for all ERISA claims.

The court in Coppe was the most direct in concluding that "Congress has not purported to grant tribal courts jurisdiction over ERISA claims." Coppe, 2015 WL 1137733, at *2. The Coppe court reasoned:

> [W]e hold that tribal rights to make laws governing members and to regulate activity upon the reservation does not exclude federal authority as expressed in ERISA to occupy and preempt the field of ERISA rights enforcement for nongovernmental plans. We note that, if an ERISA claim was brought in tribal court against a nonmember defendant or if an ERISA claim against a nongovernmental ERISA plan had to be brought first in tribal court, the same "serious anomaly" described in Nevada[3] would be present. The power of an ERISA defendant to remove the action to federal court, as exists for state court ERISA defendants, would not be present. And, the right of an ERISA plaintiff to choose a federal forum at the outset of an action would be infringed.

Id. at *3. After reviewing Neztsosie, the Coppe court continued:

> The key point is that access to a federal forum must be allowed to ERISA defendants and plaintiffs and that such access via removal would be denied to ERISA defendants if tribal courts had jurisdiction to decide ERISA claims, and such access for ERISA plaintiffs would be denied or at least infringed if cases were forced to be brought initially in tribal court.

Id. at *4.

Without question, a strong federal policy exists to support tribal self-government requiring federal court to stay certain cases to give the tribal court a full opportunity to determine its own jurisdiction. Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 16–17 (1987). But there are three exceptions to this requirement, one of which is "where the action is patently violative of express jurisdictional prohibitions." Nat'l Farmers Union Ins. Co. v. Crow Tribe of Indians, 471 U.S. 845, 856 n.21 (1985). As both courts in Peabody and Coppe concluded, given the absence of tribal court jurisdiction to hear ERISA claims, staying the federal case or requiring tribal exhaustion is

---

[3] Nevada v. Hicks, 533 U.S. 353 (2001). The Supreme Court in Nevada v. Hicks refused to recognize tribal jurisdiction in claims under 42 U.S.C. § 1983 because doing so would create "serious anomalies" where such claims brought in state court could be removed to federal court while those brought in tribal court could not. Id. at 368.

improper because it would be "patently violative of express jurisdictional prohibitions." 2013 WL 2370620, at *6 (quoting Nat'l Farmers Union Ins. Co., 471 U.S. at 856 n.21); 2015 WL 1137733, at *5.

The fact that Defendants' tribal court Complaint does not plead an ERISA cause of action does not alter the analysis. State law claims arising from an ERISA plan are preempted by ERISA and a party cannot avoid ERISA preemption by only pleading common law claims. See Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 47–48 (1987); Parkman v. Prudential Ins. Co. of Am., 439 F.3d 767, 771–72 (8th Cir. 2006); Fink v. Dakotacare, 324 F.3d 685, 688–89 (8th Cir. 2003); Howard v. Coventry Health Care, of Iowa, Inc., 293 F.3d 442, 445–47 (8th Cir. 2002). ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). "ERISA, therefore, preempts state common law causes of action that reference or pertain to an ERISA plan." Eide v. Grey Fox Tech. Servs. Corp., 329 F.3d 600, 604 (8th Cir. 2003) (citation omitted). "[T]he Supreme Court held that ERISA's civil enforcement provisions, codified at 29 U.S.C. §1132(a), are 'the exclusive vehicle for actions by ERISA-plan participants and beneficiaries asserting improper processing of a claim for benefits.' . . . [S]tate law causes of action are completely preempted by ERISA when they 'arise from the administration of benefits.'" Fink, 324 F.3d at 688–89 (quoting Pilot Life Ins. Co., 481 U.S. at 52; Kuhl v. Lincoln Nat. Health Plan, 999 F.2d 298, 302–04 (8th Cir. 1993), cert. denied, 510 U.S. 1045 (1994)).

Defendants' tribal court Complaint asserts breach of contract, fraud, and bad faith claims. All of these causes of action "arise from the administration of benefits" under the Plan and are preempted by ERISA. See 29 U.S.C. § 1144(a); Pilot Life Ins. Co., 481 U.S. at 47–48. As

established above, Congress intended for federal courts, and not tribal courts, to have jurisdiction over ERISA claims.

2. **Whether Tribal Jurisdiction Exists Under Montana**

The parties dispute whether the Cheyenne River Sioux Tribal Court has jurisdiction over TriNet and MetLife. When, as here, a tribe's jurisdiction "is not specifically authorized by federal statute or treaty, a tribe's adjudicatory authority must stem from its 'retained or inherent sovereignty.'" Att'y's Process & Investigation Serv., Inc. v. Sac & Fox Tribe of Miss. in Iowa, 609 F.3d 927, 934 (8th Cir. 2010) (hereinafter "Att'y's Process One") (quoting Atkinson Trading Co., Inc. v. Shirley, 532 U.S. 645, 649–50 (2001)). The Supreme Court long has recognized Indian tribes as "distinct, independent political communities." Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 559 (1832). Indian tribes retain a sovereignty of "a unique and limited character," United States v. Wheeler, 435 U.S. 313, 322–23 (1978), including, but not limited to, self-governance over tribal members within the boundaries of the tribes' reservation lands. United States v. Mazurie, 419 U.S. 544, 557 (1975). After all, tribes had dominion over this continent prior to settlement of Europeans and expansion of these settlements. The extent to which tribes retain or possess adjudicatory authority has been defined primarily by judicial decisions. Att'y's Process One, 609 F.3d at 934 (citing Felix Cohen, Cohen's Handbook of Federal Indian Law, § 7.01 (5th ed. 2005)). "Whether a tribal court has authority to adjudicate claims against a nonmember is a federal question within the jurisdiction of the federal courts." Id. (citation omitted).

Indian tribes generally lack legal authority over people who are not tribal members. Plains Com. Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 328 (2008). The decision that the Supreme Court has described as "pathmarking" in defining tribal legal authority over non-Indians is Montana v. United States, 450 U.S. 544 (1981). See Strate v. A-1 Contractors, 520 U.S. 438,

445 (1997). In <u>Montana</u>, the Supreme Court recognized that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." <u>Montana</u>, 450 U.S. at 565. The Court in <u>Montana</u> then recognized two exceptions to this general principle under which tribes may exercise "civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." <u>Id.</u>; <u>see also</u> <u>Plains Com. Bank</u>, 554 U.S. at 329. Because <u>Montana</u> involved a question of the extent of tribal regulatory authority, the Court in <u>Montana</u> phrased the two exceptions as follows:

> A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

<u>Montana</u>, 450 U.S. at 565–66 (internal citations omitted).

The Supreme Court has employed the <u>Montana</u> exceptions in determining whether a tribal court has adjudicatory jurisdiction over non-Indians. <u>See</u> <u>Strate</u>, 520 U.S. at 442–45. In <u>Strate</u>, a case involving the jurisdiction of a tribal court over personal injury actions against non-Indian defendants, the Court summarized the principles of the <u>Montana</u> decision as they relate to tribal court jurisdiction as follows:

> <u>Montana</u> thus described a general rule that, absent a different congressional direction, Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land within a reservation, subject to two exceptions: The first exception relates to nonmembers who enter consensual relationships with the tribe or its members; the second concerns activity that directly affects the tribe's political integrity, economic security, health, or welfare.

<u>Id.</u> at 446. "'If the Tribe retains the power under <u>Montana</u> to regulate [nonmember] conduct,' it makes no 'difference whether it does so through precisely tailored regulations or through' litigation in tribal court." <u>Fox Drywall & Plastering, Inc. v. Sioux Falls Const. Co.</u>, No. 12-4026, 2012 WL

1457183, at *7 (D.S.D. Apr. 26, 2012) (quoting Att'y's Process One, 609 F.3d at 938) (alteration in original).

Defendants assert the tribal court has jurisdiction over Plaintiffs based upon the first Montana exception. Defendants contend Plaintiffs sought out Joye, entered into a contractual relationship with her, and proceeded to collect premiums from her that she earned while living and working on a reservation. Plaintiffs counter that Joye was not sought out, but rather offered employee benefits as one of those individuals eligible through her employment. Plaintiffs also contend that their conduct in providing life insurance benefits to Joye does not expose them to tribal court jurisdiction.

This Court questions whether the tribal court has jurisdiction over Plaintiffs. In Coppe, a district court did not defer to tribal court jurisdiction over a plan extending benefits to a tribal casino's employees. 2015 WL 1137733, at *5. Notably, the casino was a non-corporate operating arm of the tribe and maintained a self-funded plan of healthcare benefits, which came from the casino's general operating expenses. Id. at *1. The healthcare plan at issue there was managed by the tribe's council members, and a judgment against it arguably could have come "from the tribal treasury or the casino's general operating fund." Id.

Here, the Cheyenne River Sioux Tribe does not have a similar connection to the Plan as the tribe did in Coppe. Neither IEN nor TriNet appear to be an arm of the Cheyenne River Sioux Tribe. The Plan is not managed by tribal council members and a judgment in this case would not come from the Cheyenne River Sioux Tribe treasury. This is not a compelling case for tribal court jurisdiction under Montana to justify deference to the Cheyenne River Sioux Tribal Court, particularly under these circumstances where the claims relate to a life insurance benefit under an ERISA-governed plan.

### C. Dataphase Factors

#### 1. Likelihood of Success on the Merits

The first and most significant Dataphase factor considers "the probability that movant will succeed on the merits." Dataphase, 640 F.2d at 114. Plaintiffs' Complaint contains three claims for relief regarding the Plan: (1) equitable relief to enforce the terms of the Plan and to determine the rights and obligations of the parties under the Plan; (2) declaratory relief in the form of a declaration that (a) the Cheyenne River Sioux Tribal Court does not have jurisdiction over the claims asserted in the tribal court Complaint, (b) the Cheyenne River Sioux Tribal Court cannot lawfully proceed with the tribal court Complaint, (c) any actions taken or ruling by the Cheyenne River Sioux Tribal Court are void and without legal effect, and (d) all claims asserted in the tribal court Complaint are preempted by ERISA; and (3) injunctive relief enjoining Defendants from proceeding with the tribal court Complaint in Cheyenne River Sioux Tribal Court and enjoining Defendants from pursuing claims for relief and seeking relief inconsistent with and preempted by ERISA. See Doc. 1. Here, the likelihood of success on the merits hinges on whether this Court, exclusive of the tribal court, has jurisdiction over the action, not on whether Defendants deserve to have been paid the life insurance benefits.

Here, for the reasons explained above, the claims are related to an ERISA-governed Plan, preempted, and proper for this Court to consider under the scheme Congress established under ERISA ensuring an available federal forum through a direct action or removal. Plaintiffs have shown a likelihood of success on the merits to the extent they seek declaratory and injunctive relief, though not on the merits of the propriety to pay Floyd rather than Defendants necessarily.

#### 2. Threat of Irreparable Harm

16

The second Dataphase factor focuses on the threat of immediate and irreparable harm. An irreparable harm is one that cannot be compensated through money. Gen. Motors Corp. v. Harry Brown's LLC, 563 F.3d 312, 319 (8th Cir. 2009) ("Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."). A party "should not be compelled to expend time and effort on litigation in a court that does not have jurisdiction." Ute Indian Tribe of the Uintah and Ouray Rsrv. v. Lawrence, 22 F.4th 892, 909–10 (10th Cir. 2022) (quoting Kiowa Indian Tribe of Okla. v. Hoover, 150 F.3d 1163, 1172 (10th Cir. 1998)) (cleaned up). This showing "satisfies the second requirement of irreparable harm." Ute Indian Tribe, 22 F.4th at 910. If the Plaintiffs were to succeed on their claims for declaratory and injunctive relief, they would be harmed by being forced to litigate in a court that lacks jurisdiction over the claim brought before it. Such a proceeding could violate their due process rights; subject them to extracontractual damages, which ERISA does not permit; and waste judicial resources. Plaintiffs have established a sufficient showing that they face an irreparable harm if the tribal court were to proceed and not dismiss that case.

### 3. Balance of the Equities

Defendants argue that enjoining them from bringing an action in tribal court will deprive them of their chosen forum where they have brought common law claims seeking punitive damages. Although they will no longer be able to pursue an action in tribal court relating to benefits under the Plan, they still have this Court as a forum to bring their dispute; they are not deprived of a forum.[4] Under ERISA, Defendants are not entitled to bring common law claims seeking punitive damages as they are preempted by ERISA. See Pilot Life Ins. Co., 481 U.S. 41;

---

[4] During the hearing, Plaintiffs acknowledged that Defendants have exhausted administrative remedies under the Plan and that the issue of what, if any, amount Plaintiffs owe Defendants under the Plan is framed by the pleadings in this case.

Parkman, 439 F.3d 767; Fink, 324 F.3d 685; Howard, 293 F.3d 442. Therefore, Defendants' asserted harm is not cognizable because common law claims seeking punitive damages are not allowed under ERISA.

On the other hand, allowing the tribal court to exercise jurisdiction over Plaintiffs, where jurisdiction is not appropriate, would cause harm to Plaintiffs. The tribal court Complaint seeks extracontractual damages, which are not allowed under ERISA. As discussed above, this harm is considered irreparable. Ute Indian Tribe, 22 F.4th at 909–10. Therefore, the balance of equities favors Plaintiffs.

### 4. Public Interest

Generally, the public interest would favor a federal court abstaining and allowing a tribal court to hear a case in the first instance. This Court is well aware of the principles of tribal exhaustion and comity. See Nygaard, 602 F. Supp. 3d 1172; Heldt v. Payday Fin., LLC, 12 F. Supp. 3d 1170 (D.S.D. 2014); Plains Com. Bank, 910 F. Supp. 2d 1188. However, here a tribal court proceeding would be patently violative of express jurisdictional prohibitions. Rather the public interest favors the "uniform regulatory regime over employee benefit plans." Davila, 542 U.S. at 208–09. Congress has portrayed this interest in ERISA's broad preemptive provisions in § 1144 and its favor toward a federal forum in § 1132(e). Therefore, the public interest weighs in favor of granting the preliminary injunction. Plaintiffs have established entitlement to a preliminary injunction as all the Dataphase factors weigh in their favor.

### D. Bond

The last issue is what bond to require. Rule 65 of the Federal Rules of Civil Procedure provides that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party

found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The amount of the bond rests within the sound discretion of the trial court . . . ." Richland/Wilkin Joint Power Auth. v. U.S. Army Corps of Eng'rs, 826 F.3d 1030, 1043 (8th Cir. 2016) (quoting Stockslager v. Carroll Elec. Coop. Corp., 528 F.2d 949, 951 (8th Cir. 1976)) (internal quotation marks omitted).

Defendants assert that a bond in the amount of $500,000 is appropriate arguing that Plaintiffs are, in bad faith, attempting to evade tribal court jurisdiction and the imposition of punitive damages. Plaintiffs assert a minimal bond in the amount of $405, the cost of filing the complaint in this case, is appropriate because the injury to Defendants is negligible if an injunction has been improvidently granted. The imposition of punitive damages on a bad-faith-failure-to-pay theory is preempted by ERISA, causing $500,000 to be an extraordinary amount for a bond. On the other hand, a bond of $405 is trivial and seems too low. This Court believes an appropriate amount for bond is $40,000, which is reasonable under the circumstances and reflects the face amount of the life insurance policy in dispute.

## IV.   CONCLUSION AND ORDER

Generally, this Court, relying on principles of comity and tribal exhaustion, would abstain from ruling on a pending action in tribal court; however, these principles do not apply if the proceeding would be patently violative of express jurisdictional prohibitions. For the reasons explained at length above, it is

ORDERED that Defendants' Motion to Stay or Dismiss Action, Doc. 25, is denied. It is further

ORDERED that Plaintiffs' Motion for Preliminary Injunction, Doc. 13, is granted and that Defendants, during the pendency of this case and unless this Court rules otherwise, are enjoined from pursuing their action in the Cheyenne River Sioux Tribal Court. It is finally

ORDERED that Plaintiffs provide bond within 21 days of entry of this Order in the amount of $40,000 as security for the preliminary injunction.

DATED this 19th day of September, 2025.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE